IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CHERYL FAYLOR,                              )
                 Plaintiff,               )
                                   )
               vs                        )     Civil Action No. 08-996
                                   )
MICHAEL SZUPPER, individually and as        )
Relocation Specialist United States Dept. of )
Housing and Urban Development (HUD);         )
JOHN TOLBERT, individually and as Field      )
Office Director, HUD; WESTMORELAND          )
COUNTY, PA., HOMES BUILD HOPE, a            )
Service of ADELPHOI, USA; WEM               )
HOUSING, L.P., CHAD RUFFNER,                )
individually and as Executive Director WEM  )
Housing L.P. and in his official capacity at )
HOMES BUILD HOPE; PROFESSIONAL              )
COMMUNITY COORDINATORS, INC.,               )
CARLOTTA PAIGE, individually and in         )
her official capacity AT PROFESSIONAL       )
COMMUNITY COORDINATORS, INC., and           )
THOMAS BALYA and THOMAS CERASO,             )
individually and in their official capacity as )
Commissioners for Westmoreland County, PA.  )
                Defendants.              )

MEMORANDUM OPINION AND ORDER

MITCHELL, Magistrate Judge:

         Presently before the Court are motions for summary judgment submitted by the

defendants. For reasons discussed below, the motion for summary judgment filed by defendant

Westmoreland County, PA (Document No. 126) will be granted, the motion for summary

judgment filed by defendants Homes Build Hope, Inc., WEM Housing, L.P., and Chad Ruffner

(Document No. 124) will be granted, and the motion to dismiss or for summary judgment filed

by defendants Professional Community Coordinators, Inc. and Carlotta Paige (Document No. 128), treated as a motion for summary judgment, will be granted.

On December 8, 2008, plaintiff Cheryl Faylor, proceeding pro se, filed an amended civil rights complaint pursuant to the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 ("URA"), 42 U.S.C. §§ 4601, et seq.[1]  In her amended complaint, the plaintiff alleges that the defendants failed to comply with the URA during her relocation to other housing which violated her Fourteenth Amendment rights to equal protection (Count I) and due process (Count II) under 42 U.S.C. § 1983.  She also complains that the defendants engaged in a conspiracy to violate her rights under 42 U.S.C. § 1985(3) (Count V) and were liable for breach of contract/unjust enrichment (Count III) and negligence (Count IV).[2]

In response to the amended complaint, the defendants filed motions to dismiss it, or for summary judgment which the Court granted in full or in part.[3]  Following the Court's rulings in this matter, two claims remain: (1) the plaintiff's procedural due process claim in

---

1.    The URA provides relocation benefits to persons and businesses that fit the statutory definition of "displaced persons".  Messer v. Virgin Islands Urban Renewal Board, 623 F.2d 303, 304 (3d Cir. 1980).  In relevant part, the URA defines the term "displaced person" as: "any person who moves from real property ... as a direct result of a written notice of intent to acquire or the acquisition of such real property ... for a program or project undertaken by a Federal agency or with Federal financial assistance..."  42 U.S.C. § 4601(6)(A)(i)(I).

2.    Named as defendants in the amended complaint were Michael Szupper, Relocation Specialist for the U.S. Department of Housing and Urban Development ("HUD"), John Tolbert, Field Office Director of HUD, Westmoreland County, PA, and its Commissioners Thomas Bayla and Thomas Ceraso, Homes Build Hope, WEM Housing L.P., Chad Ruffner, Executive Director of WEM Housing, Professional Community Coordinators, Inc. and Carlotta Paige.

3.    See, the Court's Memorandum Opinion and Order dated April 15, 2009, its Supplemental Memorandum Opinion and Order dated June 30, 2009, and its Memorandum Opinion and Order dated September 14, 2009.

Count II against Westmoreland County, Homes Build Hope, Inc. ("HBH"), WEM Housing, Chad Ruffner, Professional Community Coordinators, Inc. ("PCC") and Carlotta Paige; and (2) the plaintiff's negligence claim in Count IV against HBH, WEM Housing, Ruffner, PCC and Paige.

The following facts are undisputed.  During time periods relevant to this suit, the plaintiff resided at 411 South Sixth Street in Jeannette, PA, where she rented a row-house unit that was targeted for demolition to make way for a renovation project called the Jeannette 6th Street Project (the "Project").  The Project utilized federal funding through HUD's HOME Investment Partnership Program (the "HOME program").

Under the HOME program, Westmoreland County (the "County") received federal funds from HUD to disburse to qualified projects for the construction of low-income housing.  The County accepted these funds and entered into a series of agreements with HUD, whereby the County agreed to comply with the URA in relocating residents whose dwellings were acquired for such projects.

In this case, the County disbursed HUD funds for the Project to HBH, which owns and operates housing units for qualified low-income residents.  HBH named WEM Housing to act as the general contractor on the Project.  As general contractor, WEM Housing hired PCC and Carlotta Paige to assist in relocating residents affected by the Project.

On February 21, 2007, HBH and the previous owners of the plaintiff's residence, Stephen R. McCann and Christine A. McCann (the "McManns"), entered into an Agreement of Sale for HBH to purchase a residential row-house on South Sixth Street where the plaintiff resided (the "Property").  The Agreement of Sale was contingent on the satisfaction of eight particular items before HBH could close on its purchase of the Property.  From the time the

parties entered into the Agreement of Sale until they closed on the Property on August 23, 2007, the McCanns maintained control of the Property and collected rents from tenants there.

On or about March 2, 2007, employees of PCC hand-delivered a letter from HBH to residents of the Sixth Street properties, including the plaintiff, informing them that they may be displaced by the Project, and if that occurred, they may be eligible for relocation benefits under the URA.  The letter also advised residents that they would not be forced to move without at least 90 days notice.  On April 2, 2007, employees from PCC met with the plaintiff to obtain information from her which would be used to complete her relocation assistance.

The plaintiff avers that she received no further information or contact from HBH or PCC until August 2007, by which time her row-house unit and other units in the building had fallen into disrepair.  For instance, the plaintiff asserts that rotting trash and discarded mattresses accumulated in front of the building, grass and weeds grew taller than four feet high, and cockroaches, fleas and other vermin were present on the premises.  However, the plaintiff was aware that the McCanns owned the Property at this time, and accordingly, she complained to them about its poor condition.

On August 23, 2007, the purchase of the Property closed, and the Agreement of Sale was assigned to WEM Housing.  At that juncture, the plaintiff received a welcome letter from HBH (now the owner of her row house unit), which provided her with contact information for emergencies and instructions for the payment of rent.  The plaintiff contacted HBH about the condition of the Property, and in response, HBH's Executive Director, Mr. Ruffner, visited the Property and arranged for pest control services to be performed and for the grass to be cut there.

On September 12, 2007, Carlotta Paige informed the plaintiff that PCC was in the

process of calculating her relocation assistance and finding comparable dwellings for her.  As such, PCC contacted the plaintiff about the amount she claimed on her income tax returns and began investigating her income.  On September 20, 2007, HBH notified the plaintiff that she was eligible for relocation assistance and would need to relocate to a different residence upon 90 days notice.  This correspondence also informed the plaintiff that when she moved, she would be entitled to relocation assistance pursuant to the URA's specific guidelines.

On October 8, 2007, the plaintiff sent a letter to HBH, thanking Mr. Ruffner for his prompt attention to her vermin problem and indicating her intent to move from her Sixth Street residence.  On October 12, 2007, HBH provided notice to the plaintiff that she must vacate her rental unit within 90 days.  This correspondence also informed the plaintiff that she was eligible for a relocation allowance, encompassing $1,450.00 for a moving allowance and $17,262.00 for rental assistance under URA guidelines.

On or about October 19, 2007, PCC called the plaintiff and invited her to see a potential replacement dwelling on Urania Avenue in Jeannette, PA.  Although the landlord did not appear for the appointment to see that property, the plaintiff identified a nearby home for rent on George Street that she wished to see.  On or about October 20, 2007, PCC made an appointment for the plaintiff to see the George Street house, and after seeing it, the plaintiff indicated her desire to lease it.

On October 22, 2007, the plaintiff signed a lease for the George Street house, and Paige provided her with a check for $1,275.00 to cover the security deposit and the first month's rent.  PCC also issued the plaintiff a check for $1,450.00 for her moving allowance.  At that time, Paige informed the plaintiff that the remainder of her relocation assistance would be paid prior to

her December rent being due on December 1, 2007.

On November 26, 2007, Paige sent a letter to the plaintiff, advising her that PCC was prepared to make her final rental assistance payment.  On November 29, 2007, the plaintiff's husband went to PCC and accepted a check for $16,047.00 which constituted, as then determined, their final relocation rental assistance payment.

By letter dated December 2, 2007, the plaintiff informed HBH and HUD of her intent to appeal her relocation assistance determination, as she believed she was entitled to additional funds in the amount of $16,907.20 pursuant to Section 104(d) of the Housing and Community Development Act of 1974.  In response to her appeal, the plaintiff received letters from Mr. Tolbert at HUD, informing her that he was aware of her appeal and had directed HBH to respond to it by February 2, 2008.

In a letter dated February 1, 2008, HBH informed the plaintiff that while it was working together with HUD on her appeal, it needed additional documents to verify her income. As such, HUD extended the appeal period while it waited for verification of the plaintiff's income from the Internal Revenue Service.

By letter dated March 13, 2008, HUD advised the plaintiff that having reviewed her appeal, it determined she was eligible to receive an additional $9,461.20 in relocation assistance, based on a recalculation of her eligibility using a 60-month rental assistance period under Section 104(d), rather than the previously used 42-month period under the URA.  In response, the plaintiff wrote a letter to Mr. Tolbert dated March 17, 2008, expressing her dissatisfaction with the recalculated amount of her rental assistance.

On March 31, 2008, the plaintiff received a check from HUD in connection with

her appeal in the amount of $9,961.20, which entailed an overpayment of $500.00. HBH sent a letter to the plaintiff requesting her to return the $500 overpayment, but she did not do so. On April 28, 2008, the plaintiff sent a letter to Tolbert, reiterating her dissatisfaction with the appeal determination, as she believed she was due an additional sum of $6,946.00. To date, the plaintiff has received $28,733.20 in total rental and relocation assistance.

The URA is designed to minimize the hardship of displacement on persons like the plaintiff who are displaced as a direct result of programs or projects undertaken by a federal agency or with federal financial assistance. 42 U.S.C. § 4621(b). To that end, the URA provides relocation services and assistance to displaced persons. See, 42 U.S.C. § 4625 and 49 C.F.R. Part 24.[4] The parties agree that the plaintiff was eligible to receive several types of URA relocation services, including: relocation advisory services pursuant to 49 C.F.R. § 24.205; relocation notices pursuant to 49 C.F.R. § 24.203; reimbursement for moving expenses pursuant to 49 C.F.R. §§ 24.301 and 24.302; and payments for the added cost of replacement housing or rental assistance pursuant to 49 C.F.R. §§ 24.401-24.403.

In her Fourteenth Amendment procedural due process claim under 42 U.S.C. § 1983, the plaintiff contends that the defendants failed to comply with the URA in several respects -- such as by failing to provide certain relocation notices and services to her, not properly calculating her relocation benefits or making timely payment, and not promptly or

---

4. In pertinent part, the URA mandates that "[p]rograms or projects undertaken by a Federal agency or with Federal financial assistance shall be planned in a manner that (1) recognizes, at an early stage in the planning of such programs or projects ... the problems associated with the displacement of individuals ..., and (2) provides for the resolution of such problems in order to minimize adverse impacts on displaced persons ... 42 U.S.C. § 4625(a). Under the URA, the head of any displacing agency is to ensure that relocation assistance advisory services and programs are made available to persons displaced by such agency. 42 U.S.C. §§ 4625(b)-(c).

properly determining her appeal -- for which she seeks monetary damages.

Initially, we note that following the Supreme Court's opinion in Gonzaga Univ. v. Doe, 536 U.S. 273 (2002), case law has cast doubt on whether the URA provides a private right of action for money damages.  In Gonzaga, the Supreme Court discussed the factors to be used in determining whether a statute confers a private right of action, Id. at 282-83, emphasizing that if Congress wished to create new rights enforceable under § 1983 or an implied right of action, "it must do so in clear and unambiguous terms".  Id. at 290.  In Gonzaga, the Court explained that "'whether Congress ... intended to create a private right of action [is] definitively answered in the negative' where a 'statute by its terms grants no private rights to any identifiable class.'" Id. at 283-84, quoting Touche Ross & Co. v. Redington, 442 U.S. 560, 576 (1979).  "For a statute to create such private rights, its text must be 'phrased in terms of the persons benefited.'"  Gonzaga, 536 U.S. at 284, quoting Cannon v. Univ. of Chicago, 441 U.S. 677, 692, n. 13 (1979).  Further, "even where a statute is phrased in such explicit rights-creating terms, a plaintiff suing under an implied right of action still must show that the statute manifests an intent 'to create not just a private *right* but also a private *remedy*.'" Gonzaga, 536 U.S. at 284 (emphasis added), quoting Alexander v. Sandoval, 532 U.S. 275, 286 (2001).

Applying the Supreme Court's analysis in Gonzaga, the Fifth Circuit Court of Appeals has held that "the URA does not create a private right of action for money damages." Delancey v. City of Austin, 570 F.3d 590, 594 (5th Cir. 2009).  That is because in Delancey, the Court ruled that the URA provisions before it, 42 U.S.C. § 4625(b)-(c), lacked "rights-creating indicia", as they were "directed at the 'head of any displacing agency' rather than at the individuals benefitted by the statute".  Id.

8

In a pre-<u>Gonzaga</u> case, the Third Circuit Court of Appeals held that a private cause of action existed against state officials for violations of § 4625 of the URA due to the absence of a comprehensive enforcement scheme under the Act.  <u>Pietroniro v. Borough of Oceanport</u>, 764 F.2d 976, 980 (3d Cir. 1985), <u>cert. denied</u>, 474 U.S. 1020 (1985).  Recently however, in <u>Munoz v. City of Philadelphia</u>, 346 Fed.Appx. 766, 769, n.6 (3d Cir. 2009), the Third Circuit Court of Appeals stated:

> We highly doubt whether, in light of <u>Gonzaga</u> ... [that]
> 42 U.S.C. § 4625(a) does create a private right enforceable
> under § 1983.

In <u>Munoz</u>, the Court did not decide the issue of whether the URA confers a private right of action enforceable under § 1983; instead, the Court decided the case on alternate grounds.  <u>Id.</u>

Here, absent a definitive ruling from our Court of Appeals on the issue, and as the defendants have not presented arguments utilizing a <u>Gonzaga</u> analysis on the question of whether the URA confers a private right of action for money damages, we will address the merits of the plaintiff's procedural due process claim on other grounds.  That is because even assuming, arguendo, that the URA confers a private right of action for money damages under § 1983, the plaintiff has not shown that the defendants violated her procedural due process rights.

<u>The County's motion for summary judgment:</u>

In moving for summary judgment on the lone § 1983 claim against it, the County makes several arguments.  First, it asserts that the plaintiff has failed to establish municipal liability against it, as she has not shown that a County policy or custom violated her rights.  In addition, the County insists that the plaintiff cannot prove it violated her procedural due process rights, nor show it was notified of her displeasure regarding her relocation until after her appeal

was processed by HUD and HBH.

   To establish liability under 42 U.S.C. § 1983, the plaintiff must show that the

defendants, acting under color of law, violated her federal constitutional or statutory rights and

thereby caused her complained-of injury.  Biliski v. Red Clay Con. Sch. Dist. Bd. of Educ., 574

F.3d 214, 219 (3d Cir. 2009).  As to the County, it is clear that a municipality "cannot be held

liable for the unconstitutional acts of its employees on a theory of respondeat superior."  Berg v.

County of Allegheny, 219 F.3d 261, 275 (3d Cir. 2000), cert. denied, 121 S.Ct. 1081 (2001).

Rather, to establish a § 1983 claim against it, a complainant "must demonstrate that the violation

of h[er] rights was caused by either a policy or custom of the municipality."  Id.

   In Berg, supra, the Third Circuit Court of Appeals explained:

> Policy is made when a decisionmaker possessing final
> authority to establish municipal policy with respect to the
> action issues an official proclamation, policy, or edict...
> Customs are practices of state officials so permanent and
> well settled as to virtually constitute law.

Id. (citations omitted).  In cases where "a § 1983 plaintiff identifies a municipal policy or custom,

[s]he must demonstrate that, through its deliberate conduct, the municipality was the 'moving

force' behind the alleged injury."  Id. at 276.

   An official policy may arise when a decision to adopt a particular course of action

is properly made by a government's authorized decision-makers.  Pembaur v. City of Cincinnati,

475 U.S. 469, 481 (1986).  In this case, the County, through its Commissioners, entered into

agreements with HUD pursuant to the HOME Program to develop affordable housing with

federal HOME funds.  The County loaned HOME funds to HBH to develop the Project, and it

provided certifications that it would comply with the URA as a condition for its receipt of the

funds.  In connection therewith, the County assumed responsibility for program management, and
it acknowledges it had a duty to monitor the progress of the Project.

   To the extent these acts constituted an official policy, the plaintiff has not shown
that the County was deliberately indifferent to her rights and the moving force behind her alleged
harm.  For instance, the plaintiff has not produced evidence showing that the County failed to
monitor the Project.  Likewise, she has not shown that the County was deliberately indifferent to
her rights, violated her rights, or encouraged others to violate her rights.  While the plaintiff
contends that the County and other defendants violated her procedural due process rights, the
record shows otherwise.

   To prevail on a claim for deprivation of procedural due process under § 1983, a
plaintiff must show that (1) she was deprived of an individual interest that is encompassed within
the Fourteenth Amendment, and (2) the procedures available to her did not provide due process
of law.  Biliski, supra, 574 F.3d at 219, citing Hill v. Borough of Kutztown, 455 F.3d 225, 234
(3d Cir. 2006).  We have previously ruled that the plaintiff has a protected property interest in
relocation benefits.[5]

---

5. The United States Supreme Court has recognized that certain benefits distributed by the
government are a form of property protected by the due process clause.  See, Mathews v.
Eldridge, 424 U.S. 319 (1976); Goldberg v. Kelly, 397 U.S. 254 (1970).  To have a property
interest in a benefit, a person must "have a legitimate claim of entitlement to it."  Board of
Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972).  In Roth, supra, the Court explained
that property interests are not created by the Constitution itself.  Rather, they are created from an
independent source -- such as state law or a statute -- which secures benefits and supports claims
of entitlement to them.  Id.  The URA mandates that "[w]henever a program or project to be
undertaken by a displacing agency will result in the displacement of any person...", such person
is entitled to relocation benefits, including moving and related expenses. 42 U.S.C. § 4622(a)-(b).
It is not disputed that the plaintiff is a "displaced person" under the Act who is entitled to receive
relocation benefits.  Thus, it appears that she has a protected property interest in such benefits.

To establish a procedural due process claim, however, the plaintiff must also prove that she received constitutionally inadequate process in connection with the deprivation of her benefits.  As discussed below, the process that the plaintiff received comported with the dictates of due process.

As part of her claim, the plaintiff asserts that the defendants failed to provide adequate and timely relocation notices and services to her.  Under federal regulations, the plaintiff was entitled to receive the following relocation notices: a general information notice, a notice of relocation eligibility, and a ninety-day notice.  See, 49 C.F.R. § 24.203(a)-(c).  The plaintiff received all of the notices.  Still, she argues that the notice of relocation eligibility was not promptly sent to her and failed to specify the amount of assistance she would receive.[6]

It is provided in 49 C.F.R. § 24.203(b):

Notice of relocation eligibility.  Eligibility for relocation assistance shall begin on the date of a notice of intent to acquire (described in § 24.203(d)), the initiation of negotiations (defined in § 24.2(a)(15)), or actual acquisition, whichever occurs first.  When this occurs, the Agency shall promptly notify all occupants in writing of their eligibility for applicable relocation assistance.

The plaintiff contends that her eligibility for relocation assistance began on February 21, 2007, when HBH signed an Agreement of Sale with the McCanns which was the "initiation of negotiations", at which time the agency was to notify her in writing of her eligibility for relocation assistance, but it failed to do so.

Importantly however, the Agreement of Sale was contingent on the satisfaction of eight particular items before HBH could close on its purchase of the Property, including securing

---

6.   See, plaintiff's deposition at pp. 20-33, 62-66, 91-95.

funding approval for the Project.  Prior thereto, the McCanns maintained control of the Property.

In July 2007, the County approved the Project.  On August 23, 2007, the purchase of the Property

closed, and HBH became the legal owner of the Property.  Less than a month later, on September

20, 2007, HBH notified the plaintiff that she was eligible for relocation assistance. Under these

circumstances, we agree with the defendants that no violation of procedural due process occurred

in connection with the timing of the notice.

        The plaintiff also believes the notice of relocation eligibility was deficient, as it

did not apprise her of the amount of assistance she was eligible to receive.  Clearly however, the

above-quoted regulation governing such notice of relocation eligibility does not require the

notice to contain the amount of assistance a person may receive.

        In addition, the plaintiff claims that she was not afforded adequate relocation

services, as comparable replacement dwellings were not made available to her.  As previously

discussed, however, on or about October 19, 2007 (one week after the plaintiff received her 90-

day notice), PCC called the plaintiff and invited her to see a potential replacement dwelling on

Urania Avenue.  When the landlord did not appear to show that property, the plaintiff identified a

nearby home for rent on George Street that she wished to see.  On October 20, 2007, PCC made

an appointment for the plaintiff to view the George Street house, and after seeing it, the plaintiff

expressed her desire to lease it.  On October 22, 2007, the plaintiff signed a lease for the George

Street house, and that is where she currently resides.  Having leased one of the first replacement

dwellings she was shown, the plaintiff's claim of inadequate relocation services lacks merit.

        In further attempting to show a deprivation of procedural due process, the plaintiff

insists that the defendants failed to promptly and adequately process her appeal of the relocation

assistance determination as mandated in 49 C.F.R. § 24.10.  We disagree.[7]

   "[T]o determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate.  This inquiry would examine the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, and any remedies for erroneous deprivations provided by statute or tort law."  Zinermon v. Burch, 494 U.S. 113, 126 (1990).

   The URA does not provide a hearing for relocation benefit claims, and the plaintiff does not profess entitlement to a hearing.  Rather, the Act authorizes the "head of the lead agency" (i.e., the Department of Transportation, see, 42 U.S.C. § 4601(12)) to issue regulations and establish procedures to assure that an aggrieved person may have her claim for benefits reviewed by the head of an agency having authority over the project.  42 U.S.C. § 4633(b).  Under federal regulations implementing the URA, "[a]ny aggrieved person may file a written appeal with the Agency in any case in which the person believes that the Agency has failed to properly consider [her] application for assistance", including "a relocation payment".  See, 49 C.F.R. § 24.10(b).  The term "Agency" means: "the Federal Agency, State, State Agency, or person that acquires real property or displaces a person." 49 C.F.R. § 24.2(a)(1).

   According to the plaintiff, the defendants failed to notify her of the proper agency

---

7. In pertinent part, 49 C.F.R. § 24.10 provides: (a) "The Agency shall promptly review appeals in accordance with the requirements of applicable law and this part."; (e) "The Agency shall permit a person to inspect and copy all materials pertinent to his or her appeal ..."; (f) "In deciding an appeal, the Agency shall consider all pertinent justification and other material submitted by the person, and all other available information that is needed to ensure a fair and full review of the appeal."; (g) "Promptly after receipt of all information submitted by a person in support of an appeal, the Agency shall make a written determination on the appeal, including an explanation of the basis on which the decision was made..."; (h) "The Agency official conducting the review of the appeal shall be either the head of the Agency or his or her authorized designee."

in which to appeal; failed to provide her with access to her relocation file as she requested; failed to promptly review her appeal and consider its justification; failed to assign an authorized agency official to review her appeal; failed to properly recalculate her rental assistance payment; and failed to promptly notify her in writing of her appeal determination.[8]

With respect to the plaintiff's claim that she was not provided access to her relocation file, the record shows that on November 17, 2007, she wrote to HBH requesting that it provide her access to her relocation file.  On November 20, 2007, HBH responded to her request by advising her to contact PCC for the file, as PCC was handling her relocation, and the file was in its possession.  The plaintiff did not make a further request for the file.  Thus, contrary to her position, the plaintiff was not denied access to her relocation file.

As to her appeal, the plaintiff admits that she did not notify the County that she was displeased with the amount of her relocation assistance.  Instead, on or about December 2, 2007, the plaintiff notified HBH and HUD of her intent to appeal her relocation assistance determination.  The plaintiff attached a claim form and filled it out with what she believed was the proper calculation of additional assistance to which she was due: $16,907.20.

By letter dated December 6, 2007, HUD informed the plaintiff that her appeal would be handled by HBH.  The plaintiff then wrote a letter to HUD dated January 4, 2008, attempting to preserve her appeal rights to it, even though she had not received a response from HBH on her appeal.  In a letter dated January 10, 2008, HUD apprised the plaintiff that HBH's response to her appeal was not due until February 2, 2008.

On February 1, 2008, HBH contacted the plaintiff and asked her to provide a

8.   See, amended complaint at ¶¶ 100 H-M, O.

signed copy of her Form 1040, Schedule C tax return, certifying it was a true and accurate copy of the one filed with the Internal Revenue Service.  After receiving this information, HUD notified the plaintiff by letter dated March 13, 2008 that it reviewed her appeal and determined she qualified for additional assistance in the amount of $9,461.20.

According to the plaintiff, she did not receive a prompt determination of her appeal.  Pertinent regulations provide: "Promptly after receipt of all information submitted by a person in support of an appeal, the Agency shall make a written determination on the appeal...".  49 C.F.R. § 24.10(g).  Since the regulations do not specify a definitive time period in which an Agency must make a written determination, we find that the plaintiff received a prompt determination of her appeal after she submitted all requested information.

The plaintiff also insists that PCC and Ms. Paige were improperly involved in the review of her appeal.  To the extent that PCC and Paige were involved in the appeal process, it was in providing requested information to HUD for its review of the appeal.  Certainly, this did not violate the plaintiff's due process rights, as relevant regulations provide: "In deciding an appeal, the Agency shall consider all pertinent justification... and all other available information that is needed to ensure a fair and full review of the appeal." 49 C.F.R. § 24.10(f).

The plaintiff also believes the recalculated amount of her relocation assistance was arbitrary.  However, that issue is not before us.  Rather, the question is whether the plaintiff suffered a deprivation of procedural due process in violation of § 1983.  Based on the forgoing discussion, she did not.

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and

the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). With respect to the plaintiff's procedural due process claim, no material issue of fact is in dispute, and for reasons discussed above, the County is entitled to judgment as a matter of law.

PCC & Paige and HBH, WEM & Ruffner's motions for summary judgment:

In support of their motions, these defendants argue that the plaintiff cannot prevail on her civil rights claim under 42 U.S.C. § 1983, as she has not shown they are state actors. In addition, the movants aver that the plaintiff has not established a deprivation of due process.

As recited above, to establish liability under § 1983, the plaintiff must show that the defendants, acting under color of state law, violated her federal constitutional or statutory rights and thereby caused her complained-of injury. Biliski, supra, 574 F.3d at 219. In regard to the "under color of state law" requirement, the United States Supreme Court has stated: "When Congress enacted § 1983 as the statutory remedy for violations of the Constitution, it specified that the conduct at issue must have occurred under color of state law; thus liability attaches only to those wrongdoers who carry a badge of authority of a State and represent it in some capacity." NCAA v. Tarkanian, 488 U.S. 179, 191 (1988).

To determine if private actors such as the defendants are subject to scrutiny under §1983, we must assess whether their alleged conduct can be "fairly attributable to the state." Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982). There is no single or uniform test to determine if a private act may be attributable to the state; however, the United States Supreme Court has developed several frameworks for determining this question, which it has summarized as follows:

> [A] challenged activity may be state action when it results
> from the State's exercise of 'coercive power', Blum [v.

17

> Yaretsky, 457 U.S. 991, 1004 (1982)], when the State provides 'significant encouragement, either overt or covert, ibid, or when a private actor operates as a 'willful participant in joint activity with the State or its agents,' Lugar [supra, 457 U.S. at 941]. We have treated a nominally private entity as a state actor when it is controlled by an 'agency of the State', Pennsylvania v. Board of Directors of City Trusts of Philadelphia, 353 U.S. 230, 231 (1957) (per curiam), when it has been delegated a public function by the State, cf., e.g., West v. Atkins, [487 U.S. 42, 56 (1988); Edmonson v. Leesville Concrete Co., 500 U.S. 614, 627-628 (1991), when it is 'entwined with governmental policies' or when government is 'entwined in [its] management or control.' Evans v. Newton, 382 U.S. 296, 299, 301 (1966).

Brentwood Academy v. Tennessee Secondary School Athl. Ass'n., 531 U.S. 288, 296 (2001).

Utilizing Supreme Court jurisprudence, the Third Circuit Court of Appeals has outlined the following tests to determine if a private actor engages in state action: (1) "whether the private entity has exercised powers that are traditionally the exclusive prerogative of the state" (i.e., the "public function" test); (2) "whether the private entity has acted with the help of or in concert with state officials" (i.e., the "close nexus" test); and (3) "whether the state has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity" (i.e, the "symbiotic relationship" test). Kach v. Hose, 589 F.3d 626, 646 (3d Cir. 2009), citing Mark v. Borough Hatboro, 51 F.3d 1137, 1142 (3d Cir. 1995).

In attempting to show state action here, the plaintiff points to the fact that HUD and the County entered into agreements pursuant to the HOME program, wherein HUD agreed to make funds available in exchange for the County's agreement to develop affordable housing. The County contracted with HBH to develop the Project, and in connection therewith, it loaned HOME funds to HBH and WEM Housing. WEM Housing hired PCC and Ms. Paige to assist in

relocating persons displaced by the Project, and PCC agreed to provide comprehensive relocation services to HBH in connection with the Project.

Under these facts, the plaintiff has not established state action. Under the aforementioned "public function" test, state action may arise if private actors are delegated a "traditionally and exclusively" state function." Leshko v. Servis, 423 F.3d 337, 341 (3d Cir. 2005), citing Jackson v. Metropolitan Edison, 419 U.S. 345, [352]-53 (1974) (finding state action "in the exercise by a private entity of powers traditionally exclusively reserved to the State."). Importantly, "the relevant question is not simply whether a private group is serving a 'public function'", but "whether the function performed has been 'traditionally the *exclusive* prerogative of the State.'" Rendell-Baker v. Kohn, 457 U.S. 830, 842 (1981) (emphasis in original) (citations omitted).

The function of providing relocation benefits to displaced persons under the URA is not traditionally the *exclusive* prerogative of the State. Indeed, the function may be undertaken by a Federal agency, or by a person carrying out a program with Federal financial assistance. For instance, the URA mandates that the head of a "displacing agency" is to provide reasonable moving expenses to displaced persons, 42 U.S.C. § 4622(a)(1), and to ensure that relocation assistance advisory services are made available to them. Id. at §§ 4625(b)-(c). Under the URA, the term "displacing agency" means: "any Federal agency carrying out a program or project, and any State, State agency, or person carrying out a program or project with Federal financial assistance". Id. at § 4601(11). Since the function of providing relocation benefits is not traditionally the exclusive prerogative of the state, the plaintiff cannot establish state action under this test.

In addition, the plaintiff has not established state action under the aforesaid "close nexus" test or "symbiotic relationship" test.  Under the "close nexus" test, the complaining party must show "a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action may be fairly treated as that of the state itself." Blum v. Yaretsky, 457 U.S. 991, 1004 (1981) (citations omitted).

Under the "close nexus" test, a state is responsible for a private decision when it has "exercised coercive power or has provided such significant encouragement either overt or covert, that the choice must in law be deemed that of the state." Id.  Tellingly, "[t]his test is met only if it can be said that the state is responsible for the specific conduct about which the plaintiff complains." Boggi v. Medical Review and Accrediting Council, 2009 WL 2951022, *6 (E.D.Pa., Sept. 15, 2009), citing Blum, 457 U.S. at 1004.  Here, the plaintiff has not shown that the state "coerced or encouraged" the defendants' complained-of acts.  As such, she has not established facts to evince state action under the "close nexus" test.

With respect to the "symbiotic relationship" test, it provides only a "narrow" basis for finding that private action may be fairly attributable to the state.  Benn v. Universal Health System, 371 F.3d 165, 173 (3d Cir. 2004).  "A 'symbiotic relationship' demands 'a close association of mutual benefit' between the state and the private entity". Id.  Further, under the "symbiotic relationship" test, state action will not be found unless the state has "so far insinuated itself into a position of interdependence with [the entity] that it must be recognized as a joint participant in the challenged activity." Burton v. Wilmington Parking Authority, 365 U.S. 715, 725 (1961).

To the extent a "symbiotic relationship" does exist, it does so "by virtue of the

20

close involvement of the state and [its] interdependence [with an entity] and the challenged

activity, [so that] the conduct complained of is in fact 'fairly attributable' to the state." Crissman

v. Dover Downs Entertainment, 289 F.3d 231, 240-41 (3d Cir. 2001).  Here, the plaintiff has not

shown that the state was closely involved in, nor responsible for the defendants' complained-of

acts.  Thus, she has not proven state action under the "symbiotic relationship" test.

Having failed to show that the movants engaged in acts "fairly attributable to the

State", the plaintiff cannot prevail on her § 1983 claim.  Further, even assuming, arguendo, that

the defendants could be deemed state actors, the plaintiff has not shown that they deprived her of

procedural due process for reasons discussed above.

In her remaining state law claim in Count IV, the plaintiff asserts that the

defendants are liable for negligence, as they breached a duty owed to her in failing to comply

with the URA and caused her emotional distress, such as when the condition of her row-house

unit deteriorated.[9]  To prevail on a claim for negligence under Pennsylvania law, a claimant must

establish (1) a duty of care owed by the defendant, (2) a breach of that duty, (3) a causal

connection between the defendant's conduct and the claimant's resulting injury, and (4) actual

harm or damage suffered by the claimant.  Martin v. Evans, 711 A.2d 458, 461 (Pa. 1998).

Here, the plaintiff has not shown that the defendants breached a duty of care owed

to her.  As set forth in the Court's rulings in this matter, the defendants did not violate the

plaintiff's civil rights, and the plaintiff has not shown that they failed to comply with the URA.

Further, to the extent the plaintiff suffered emotional distress due to the deterioration of her row-

house unit, it is clear that the McCanns owned the Property at that time, and the plaintiff

---

9.    See, amended complaint at ¶¶ 110-114.

complained to them about its poor condition.  Later, when the purchase of the Property closed on August 23, 2007, and HBH became its owner, the plaintiff complained to it about the Property's condition, and Mr. Ruffner arranged to rectify the problem.  Based on these facts, the plaintiff's negligence claim lacks merit.

        An appropriate Order will be entered.

<u>O   R   D   E   R</u>

AND NOW, this 30th day of March 2010, for the reasons set forth in the Court's Memorandum Opinion filed this date,

IT IS ORDERED that the motion for summary judgment filed by defendant Westmoreland County, PA (Document No. 126) is granted.

IT IS FURTHER ORDERED that the motion for summary judgment filed by defendants Homes Build Hope, Inc., WEM Housing, L.P. and Chad Ruffner (Document No. 124) is granted.

AND IT IS ORDERED that the motion to dismiss or for summary judgment filed by defendants Professional Community Coordinators, Inc. and Carlotta Paige (Document No. 128), treated as a motion for summary judgment, is granted.


<u>s/ ROBERT C. MITCHELL</u>
United States Magistrate Judge